## CASE NO. 22-4519

# IN THE
# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

ZAVIEN LENOY CANADA,

*Defendant - Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AT GREENVILLE

## OPENING BRIEF OF APPELLANT

Louis H. Lang
CALLISON, TIGHE
& ROBINSON, LLC
1812 Lincoln Street
Suite 200
P. O. Box 1390
Columbia, SC 29202
803-404-6900
louislang@callisontighe.com

Cullen O. Macbeth
OFFICE OF THE FEDERAL
PUBLIC DEFENDER
Southern Division
6411 Ivy Lane
Suite 710
Greenbelt, MD 20770
301-344-0600
cullen_macbeth@fd.org

*Counsel for Appellant*

LANTAGNE LEGAL PRINTING
801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................iv

I.  STATEMENT OF SUBJECT MATTER AND
    APPELLATE JURISDICTION ...................................................................1

II.  ISSUES PRESENTED FOR REVIEW ............................................................1

III.  STATEMENT OF THE CASE.........................................................................1

IV.  SUMMARY OF ARGUMENTS.......................................................................4

V.  ARGUMENT ...................................................................................................5

I.      Section 922(g)(1) is unconstitutional because (1) felons are among
        "the people" protected by the Second Amendment, and (2) the
        United States has no historical tradition of disarming those
        convicted of felonies...................................................................................5

        A. Standard of review................................................................................5

        B. Legal background .................................................................................6

            1.  Before *Bruen*, lower courts assessed Second Amendment
                challenges by applying means-ends scrutiny...................................6

            2.  *Bruen* replaced means-ends balancing with a test rooted
                solely in the Second Amendment's "text and history."..................8

                a.  Statutes addressing longstanding societal problems are
                    subject to more rigorous scrutiny than statutes addressing
                    historically "unprecedented" challenges...................................11

                b.  The government must identify a "well-established and
                    representative" tradition of comparable regulations.................13

                c.  The government bears the burden of demonstrating that a
                    statute is consistent with the Nation's historical tradition........14

i

C. Analysis ........................................................................ 14

    1. Section 922(g)(1) fails *Bruen*'s "text-and-history standard." ........ 14

        a. The Second Amendment's "plain text" protects Canada's possession of a firearm ............................................. 15

        b. The government did not show—and will be unable to show—that § 922(g)(1) is consistent with the United States' "historical tradition of firearm regulation." ................ 22

            i. There is no tradition of statutes "distinctly similar" to § 922(g)(1) .......................................................... 22

            ii. Founding-era militia statutes confirm that felons enjoyed the right to keep and bear arms ............................ 27

            iii. The government cannot shoulder its burden by pointing to statutes that disarmed supposedly "dangerous" or "unvirtuous" groups ........................................... 29

                (a) *Bruen* requires a focus on firearm "regulations" having the force of law .................................... 30

                (b) The "dangerous" and "unvirtuous" theories are insufficiently particular .................................. 33

    2. This Court's pre-*Bruen* cases do not resolve Canada's Second Amendment claim ....................................................... 41

    3. The mandate rule did not bar consideration of Canada's motion to dismiss ........................................................ 49

II.    The district court erred in holding CDV 3rd is an ACCA predicate violent felony ................................................................ 51

    A. Standard of review ........................................................ 51

    B. Legal background .......................................................... 51

1. The ACCA and the categorical approach ......................................51

C. South Carolina's Criminal Domestic Violence Statutes ....................54

D. No South Carolina case defines the *mens rea* required to commit CDV.............................................................................................56

E. CDV 3rd Offense can be committed through reckless or negligent conduct and, therefore, is not an ACCA predicate offense ..............................................................................................57

VI. CONCLUSION.............................................................................60

Statement Regarding Oral Argument ........................................................60

Certificate of Compliance ........................................................................62

Certificate of Service ...............................................................................63

# TABLE OF AUTHORITIES

## Cases

*Binderup v. Atty Gen.*,
  836 F.3d 336 (3d Cir. 2016) .............................................................. 40

*Borden v. United States*,
  ___ U.S. ___, 141 S. Ct. 1817 (2021) ....................................... *passim*

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .................................................................. *passim*

*Doe v. Chao*,
  511 F.3d 461 (4th Cir. 2007) ...................................................... 50, 51

*Firearms Pol'y Coal., Inc. v. McCraw*,
  ___ F. Supp. 3d ___, 2022 WL 3656996
  (N.D. Tex. Aug. 25, 2022) ....................................... 27, 28, 29, 30, 31

*Hamilton v. Pallozzi*,
  848 F.3d 614 (4th Cir. 2017) .............................................................. 44

*Hengle v. Treppa*,
  19 F.4th 324 (4th Cir. 2021) ...................................................... 47, 49

*Johnson v. United States*,
  559 U.S. 133 (2010) .......................................................................... 52

*Kanter v. Barr*,
  919 F.3d 437 (7th Cir. 2019) .................................................... 39, 47

*Leocal v. Ashcroft*,
  543 U.S. 1 (2004) .............................................................................. 53

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ............................................................................ 7

*Medina v. Whitaker*,
  913 F.3d 152 (D.C. Cir. 2019) ........................................................ 39

*Moncrieffe v. Holder*,
  569 U.S. 184 (2013) .......................................................................... 52

*Myers v. Loudoun Cty. Pub. Sch.*,
    418 F.3d 395 (4th Cir. 2005) ............................................................ 49

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    ___ U.S. ___, 142 S. Ct. 2111 (2022) ..................................... *passim*

*N.R.A. v. A.T.F.*,
    700 F.3d 185 (5th Cir. 2012) ............................................................ 25

*Payne v. Taslimi*,
    998 F.3d 648 (4th Cir. 2021) ............................................................ 47

*State v. Ferguson*,
    302 S.C. 269, 395 S.E.2d 182 (1990) ............................................... 56

*State v. Sterling*,
    396 S.C. 599, 723 S.E.2d 176 (2012) ............................................... 57

*Stimmel v. Sessions*,
    879 F.3d 198 (6th Cir. 2018) ............................................................ 19

*Taylor v. United States*,
    495 U.S. 575 (1990) ......................................................................... 52

*Tyler v. Hillsdale Cty. Sheriff's Dep't*,
    837 F.3d 678 (6th Cir. 2016) .................................................... 42, 46

*United States v. Alvarez*,
    567 U.S. 709 (2012) ......................................................................... 40

*United States v. Banks*,
    29 F.4th 168 (4th Cir. 2022) ............................................................ 49

*United States v. Booker*,
    644 F.3d 12 (1st Cir. 2011) ....................................................... 24, 25

*United States v. Carrero*,
    No. 2:22-CR-00030, 2022 WL 9348792 (D. Utah Oct. 14, 2022) .................. 17

*United States v. Carter*,
    669 F.3d 411 (4th Cir. 2012) ............................................................ 45

*United States v. Chapman*,
    666 F.3d 220 (4th Cir. 2012) ............................................................. 7

*United States v. Chester*,
   628 F.3d 673 (4th Cir. 2010) ...................................................... 7, 42, 44, 47, 48

*United States v. Coombes*,
   No. 22-CR-00189-GKF, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022) ....... 17

*United States v. Drummond*,
   925 F.3d 681 (4th Cir. 2019) .............................................................. 52, 56, 60

*United States v. Hemingway*,
   734 F.3d 323 (4th Cir. 2013) ............................................................................ 51

*United States v. Hosford*,
   843 F.3d 161 (4th Cir. 2016) ................................................................. *passim*

*United States v. Jimenez-Shilon*,
   34 F.4th 1042 (11th Cir. 2022) ...................................................................... 17

*United States v. Meza-Rodriguez*,
   798 F.3d 664 (7th Cir. 2015) ................................................................ 17-18, 19

*United States v. Moore*,
   666 F.3d 313 (4th Cir. 2012) ...................................................................... 42, 43

*United States v. Norman*,
   935 F.3d 232 (4th Cir. 2019) ........................................................................... 60

*United States v. Perez-Gallan*,
   No. PE:22-CR-00427-DC, 2022 WL 16858516
   (W.D. Tex. Nov. 10, 2022) ....................................................................... 17, 19

*United States v. Pileggi*,
   703 F.3d 675 (4th Cir. 2013) .......................................................................... 50

*United States v. Proctor*,
   28 F.4th 538 (4th Cir. 2022) ........................................................................... 52

*United States v. Pruess*,
   703 F.3d 242 (4th Cir. 2012) .......................................................................... 43

*United States v. Robinson*,
   390 F.3d 833 (4th Cir. 2004), *cert. granted and judgment vacated on
   different grounds,* 544 U.S. 971 (2005) ..................................................... 50-51

*United States v. Scroggins,*
599 F.3d 433 (5th Cir. 2010) ................................................................. 46

*United States v. Skoien,*
614 F.3d 638 (7th Cir. 2010) ............................................................ 24, 25

*United States v. Smoot,*
690 F.3d 215 (4th Cir. 2012) ................................................................... 5

*United States v. Stevens,*
559 U.S. 460 (2010) .............................................................................. 39

*United States v. Vann,*
660 F.3d 771 (4th Cir. 2011) ................................................................. 51

*United States v. Williams,*
616 F.3d 685 (7th Cir. 2010) ................................................................. 46

*United States v. Young,*
No. CR 22-054, 2022 WL 16829260 (W.D. Pa. Nov. 7, 2022) ....................... 50

*Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co.,*
510 F.3d 474 (4th Cir. 2007) ................................................................. 50

## Statutes

18 U.S.C. § 922 ......................................................................... *passim*

18 U.S.C. § 924 ................................................................... 1, 2, 51

18 U.S.C. § 3231 ................................................................................ 1

21 U.S.C. § 841 ................................................................................. 1

28 U.S.C. § 1291 ............................................................................... 1

1871 Tex. Gen. Laws § 1 ................................................................ 24

S.C. Code Ann. § 16-25-20 ................................................ 54, 55, 56, 58

S.C. Code Ann. § 16-25-65 ................................................... 54, 57, 58

## Other Authorities

Adam Winkler, Heller*'s Catch-22*, 56 *UCLA L. Rev.* 1551 (2009) ............... 26, 47

Black's Law Dictionary (5th ed. 1979) ................................................. 58

C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*
32 Harv. J. L. & Pub. Pol'y 695 (2009) ........................................ 26

Carlton F.W. Larson, *Four Exceptions in Search of a Theory*,
60 Hastings L.J. 1371 (2009) ................................................... 26

Constitution and Laws of the State of New-Hampshire,
Act of Dec. 28, 1792 (1805) .................................................28-29

Herty, Digest of the Laws of Maryland, "Militia," §§ 7, 15, 19, 20 (1799).......28

Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the
Constitutional Case for Gun Control*,
92 Wash. U. L. Rev. 1187 (2015) ............................................. 26

Laws of the State of Delaware, ch. XXXVI, §§ 1, 2, 4 (1797)..........................28

Marbury, Digest of the Laws of the State of Georgia,
Act of December 24, 1792, §§ 9-10 (1802)..............................................28-29

Mitchell, Statutes at Large of Pennsylvania,
Act of March 20, 1780, §§ III, XXI (1700-1809)...................................28-29

Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence*,
56 UCLA L. Rev. 1343 (2009) ................................................... 26

Public Statute Laws of the State of Connecticut,
Title CXII, ch. I, §§ 1, 10 (1808) .............................................28

R. George Wright, *Constitutional Cases and the Four Cardinal Virtues*,
60 Clev. St. L. Rev. 195 (2012) ................................................ 40

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to
Keep Arms in Early America*, 25 Law & Hist. Rev. 139 (2007) .............. 25, 26

The Oxford English Dictionary Vol. II (1961) ..................................... 57

Thomas Greenleaf, Laws of the State of New-York,
Act of April 4, 1786 (1792) ...................................................28-29

U.S. Const. amend. II ................................................................ 6

Wright & Potter, 7 Acts and Laws of the Commonwealth of
Massachusetts, 1780-1805, ch. 14 (1898) ..................................28-29

# I. STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

This case arises from the conviction at trial and re-sentencing of Appellant, Zavien Lenoy Canada (Canada). The district court had jurisdiction under 18 U.S.C. § 3231. Canada's Judgment on remand for resentencing was entered September 2, 2022, and Canada filed his notice of appeal September 7, 2021. (JA101, JA111). This Court has jurisdiction under 28 U.S.C. § 1291.

# II. ISSUES PRESENTED FOR REVIEW

## I.

Does 18 U.S.C. § 922(g)(1) violate the Second Amendment under *Bruen*'s "text-and-history standard"?

## II.

Did the district court err in sentencing Canada as an Armed Career Criminal under 18 U.S.C. § 924(e), when his 2006 South Carolina conviction for criminal domestic violence, third offense, was not categorically a violent felony?

# III. STATEMENT OF THE CASE

Canada was charged with being a felon in possession of a firearm, possession with intent to distribute (PWID) a quantity of cocaine base, and the use and carrying of a firearm during and in relation to a drug trafficking crime, in violation of, respectively, 18 U.S.C. §§ 922(g)(1), 924(a)(2) and 924(e), 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and 18 U.S.C. § 924(c)(1)(A). (JA20).

1

Following a two-day trial, Canada was found not guilty of the PWID charge, guilty of the felon-in-possession charge and, on the government's motion, the district court dismissed the § 924(c) charge. (JA101).

Judgment was entered August 31, 2021, and Canada noted his first appeal two days later. (JA14-15). In his first opening brief, Canada argued the district court erred by failing to orally pronounce the length of his supervised-release term. *United States v. Canada*, No. 21-4455, Dkt. #26 at 2 (4th Cir. Mar. 31, 2022). The government agreed and, with Canada's consent, moved to remand the case for resentencing. *Canada*, Dkt. #40. The Court granted the government's motion on May 24, 2022. *Canada*, Dkt. #44.

On June 23, 2022, the Supreme Court issued its opinion in *New York State Rifle & Pistol Association, Inc., et al. v. Bruen*, ___ U.S. ___, 142 S. Ct. 2111 (2022). This decision upended Second Amendment doctrine, replacing this Court's prior interest-balancing approach with an analysis grounded only in constitutional "text and history." *Id.* at 2129.

On remand for resentencing, a revised presentence report (PSR) concluded Canada had three Armed Career Criminal Act (ACCA) predicate offense convictions. (JA124-125). One predicate conviction was a 2006 conviction for criminal domestic violence, third offense (CDV 3rd). (JA124).

Canada objected to the PSR's ACCA conclusion, asserting under *Borden v. United States*, ___ U.S. ___, 141 S. Ct. 1817 (2021), his CDV 3rd conviction was not an ACCA predicate because a conviction under this statute could be based on negligent or reckless, rather than intentional, conduct. (JA144-150). Canada also notified the United States Probation Officer of his contention that under *Bruen*, 18 U.S.C. § 922(g)(1) was unconstitutional on its face and as applied to him and that Count 1 of the Indictment should be dismissed. (JA154).

The United State Probation Officer rejected Canada's ACCA objection and commented that whether 18 U.S.C. § 922(g)(1) was unconstitutional was a matter for the district court to decide. (JA154).

The district court rejected Canada's *Bruen* challenge to the constitutionality of 18 U.S.C. § 922(g)(1). (JA90 - 91, JA94 – 96). The district court also overruled Canada's objection to the PSR's conclusion that his 2006 CDV 3rd conviction was an ACCA predicate offense, determining that Canada was subject to the ACCA's 15-year mandatory minimum sentence, and sentenced Canada to 220 months' imprisonment. (JA88, JA101). Judgement was entered on August 30, 2022, and Canada filed his notice of appeal September 7, 2022. (JA101, JA111).

# IV.  SUMMARY OF ARGUMENTS

**Issue I**.  Section 922(g)(1) is unconstitutional under *Bruen*'s new "text-and-history standard." 142 S. Ct. at 2138.  *Bruen* instructs that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and the government may rebut the presumption of unconstitutionality only by showing that "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126.

First, the Second Amendment's "plain text" entitles "the people" to the right to keep and bear arms, and nothing in that text or the Supreme Court's cases suggests felons are not among "the people."  Excluding felons from Second Amendment protection would violate *Heller*'s holding that "the people" includes everyone who is "part of [the] national community"; that the right to bear arms "belongs to *all* Americans"; and that "the people" means the same thing in the Second Amendment as it does in the First, Fourth, and Ninth Amendments.

Second, the government did not rebut, and will be unable to rebut, the presumption that § 922(g)(1) is unconstitutional.  The United States' "historical tradition of firearm regulation" shows that felon-disarmament laws did not appear until the 20th century—well after the period *Bruen* deems relevant.  And the government cannot discharge its burden by likening § 922(g)(1) to laws that

4

disarmed supposedly "dangerous" or "unvirtuous" groups. Those categories are far too broad under a proper *Bruen* analysis, and the government has identified no "regulations"—i.e., legal proscriptions—that substantiate such a tradition, as *Bruen* requires.

Finally, *Bruen* undermines this Court's previous cases upholding § 922(g)(1). Those cases relied on an unexplained dictum in *Heller*, but *Bruen* leaves no doubt that when that dictum conflicts with "text and history," the latter must prevail.

**Issue II.** The district court erroneously held Canada had three predicate convictions under the ACCA. South Carolina CDV 3rd statutory offense requires only that a defendant "cause" physical harm to another, without specifying that the defendant act with purpose, knowledge, or extreme recklessness. Because the plain meaning of "cause" includes reckless and negligent mens rea, CDV 3rd does not require the heightened mens rea necessary for an ACCA "violent felony."

## V.  ARGUMENT

I.    **Section 922(g)(1) is unconstitutional because (1) felons are among "the people" protected by the Second Amendment, and (2) the United States has no historical tradition of disarming those convicted of felonies.**

### A.    Standard of review

This Court "review[s] de novo a defendant's constitutional challenge to a criminal statute." *United States v. Smoot*, 690 F.3d 215, 219 (4th Cir. 2012).

### B. Legal background

### 1. Before *Bruen*, lower courts assessed Second Amendment challenges by applying means-ends scrutiny.

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller*, the Supreme Court held the Second Amendment codified a pre-existing "individual right to possess and carry weapons in case of confrontation." 554 U.S. at 592, 624 (2008). The Court canvassed "the historical background of the Second Amendment," including English history from the 1600s through American independence, law and practice in the colonial and early-republic periods, and evidence of how the Second Amendment was interpreted in the century after its enactment (e.g., legal treatises, pre-Civil War case law, post-Civil War legislation, and late-19th-century commentary). *Id.* at 592-619. Based on this survey, the Court concluded the Second Amendment "confers an individual right to keep and bear arms" that is "not limited to the carrying of arms in a militia." *Id.* at 586, 622. The Court therefore struck down District of Columbia statutes that prohibited the possession of handguns in the home and required that any other guns in the home be kept inoperable. *Id.* at 628-34.

Two years later, in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court described the right to keep and bear arms as "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *Id.* at 767. This right, the Court warned, should not be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 780.

In *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010), this Court developed a "two-part approach" for resolving Second Amendment claims. The first step asked "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee," as it was understood "at the time of ratification." *Id.* If it did not, the challenge failed. *Id.* But if the statute did "burden[] conduct that was within the scope of the Second Amendment as historically understood," the Court then "appl[ied] an appropriate form of means-end scrutiny." *Id.* The Court employed strict scrutiny if a challenger's claim implicated "the core right" recognized in *Heller*—"the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *United States v. Chapman*, 666 F.3d 220, 224, 226 (4th Cir. 2012). Otherwise, intermediate scrutiny applied. *Id.* at 225-26. Both forms of scrutiny involved weighing the governmental interest in firearm restrictions against the challenger's interest in

keeping and bearing arms. *See United States v. Hosford*, 843 F.3d 161, 168 (4th Cir. 2016).

### 2. *Bruen* replaced means-ends balancing with a test rooted solely in the Second Amendment's "text and history."

The Supreme Court's opinion in *Bruen* disavowed this Court's framework, holding that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 2127. In its place, the Court adopted a "text-and-history standard" more consistent with *Heller*'s methodology. *Id.* at 2138.

This standard directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does, then "the Constitution presumptively protects that conduct." *Id.* Answering this preliminary question in *Bruen* was straightforward. At issue was a New York law providing that to obtain a permit to carry a concealed handgun in public, an applicant had to demonstrate "proper cause," i.e., "a special need for self-protection distinguishable from that of the general community." *Id.* at 2122-23. The Court "ha[d] little difficulty concluding" that "the Second Amendment protect[ed] [the petitioners'] proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 2134. As the Court explained, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* The Second Amendment therefore "presumptively

8

guarantee[d]" a right to carry firearms in public, and New York's "proper cause" requirement, which infringed that right, could pass constitutional muster only if the state overcame the presumption. *Id.* at 2129-30, 2135.

To rebut the presumption of unconstitutionality, *Bruen* held, "the government may not simply posit that [a] regulation promotes an important interest." *Id.* at 2126. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-32. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at 2132.

The Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 2136 (emphasis in original). For that reason, the relevant "historical tradition" for purposes of a federal gun regulation is that which existed in 1791, when the Second Amendment was ratified. *Id.* at 2136. Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but they should do so with care. *Id.* at 2131-32. *Bruen* cautioned, for example, that "[h]istorical evidence that long

9

predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. Courts should not "rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies." *Id.*

Conversely, courts must "guard against giving post-enactment history more weight than it can rightly bear." *Id.* Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation." *Id.* But the farther forward in time one goes from 1791, the less probative historical evidence becomes. *See id.* at 2137 ("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources."). Evidence from "the mid- to late-19th-century" provides little "insight into the meaning of the Constitution in [1791]." *Id.* Courts should therefore credit such history to the extent it provides "confirmation" of prior practice but should otherwise afford it little weight. *Id.* That is because "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that

10

text." *Id.* (emphasis in original); *see also id.* at 2154 n.28 (ignoring "20th-century historical evidence" because it is too far removed from 1791).

The Court in *Bruen* held that because New York could not point to a robust tradition of regulations similar to the proper-cause requirement, the state's statute violated the Second Amendment. *Id.* at 2138-56. In reaching its conclusion, the Court did not elaborate a comprehensive scheme for evaluating historical evidence, but it staked certain guideposts for lower courts to follow.

> **a.    Statutes addressing longstanding societal problems are subject to more rigorous scrutiny than statutes addressing historically "unprecedented" challenges.**

To begin, the Court explained that the standard for reviewing historical evidence differs depending on what kind of problem a statute is intended to remedy—specifically, whether that problem is old or new.

In "some cases," where a challenged statute "addresses a general societal problem that has persisted since the 18th century," the historical "inquiry will be fairly straightforward." *Id.* at 2131. The government can defend such statutes only by identifying a tradition of "distinctly similar" regulations from the founding era. *Id.* If "the Founders themselves could have adopted" a particular regulation to "confront" a problem that existed in 1791, but did not do so, then that regulation is unconstitutional today. *Id.*

In "other cases," a challenged statute will "implicat[e] unprecedented societal concerns or dramatic technological changes," or will be addressed to "challenges" that are "not . . . the same as those that preoccupied the Founders in 1791." *Id.* at 2132. Historical inquiry into these statutes "may require a more nuanced approach," which "will often involve reasoning by analogy." *Id.* Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar." *Id.* The Court in *Bruen* declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but it identified "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. In other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [i.e., the 'how'] and whether that burden is comparably justified [i.e., the 'why'] are central considerations when engaging in an analogical inquiry." *Id.* at 2133 (emphasis omitted).

This latter approach to *Bruen*'s historical inquiry—which the Court called "analogical reasoning," *id.* at 2132—is less difficult for the government to satisfy. But—critically—courts may employ that approach only when the challenged statute is geared toward a societal problem that was "unimaginable at the founding." *Id.* It

is not available when the challenged statute "addresses a general societal problem that has persisted since the 18th century." *Id.* at 2131. At the threshold, therefore, courts faced with a *Bruen* challenge must identify the problem at which a statute is aimed, and then determine whether that problem existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes. *Id.* at 2132.

> **b.    The government must identify a "well-established and representative" tradition of comparable regulations.**

Whether based on "distinctly similar" precursors or merely "relevantly similar" historical analogues, the "comparable tradition of regulation" must be robust. To carry its burden, the government must show that the historical tradition on which it relies is "well-established and representative." *Id.* at 2133; *see also id.* at 2137 (explaining that "a governmental practice" can "guide [courts'] interpretation of an ambiguous constitutional provision" *if* that practice "has been open, widespread, and unchallenged since the early days of the Republic").

A handful of "outlier[]" statutes or cases from a few "outlier jurisdictions" do not make out a historical tradition. *Id.* at 2153, 2156. The Court expressed "doubt," for instance, that statutes from only three of the original thirteen colonies would establish a relevant tradition. *Id.* at 2142. And in evaluating 19th-century "surety laws," which New York argued were precursors to its proper-cause requirement, the

Court discounted two of those ten laws—which were most similar to New York's—as unrepresentative. *See id.* at 2148 n.24.

### c. The government bears the burden of demonstrating that a statute is consistent with the Nation's historical tradition.

Finally, *Bruen* emphasized that "the burden falls on [the government] to show that [a statute] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135. Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6. In consequence, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the government's] burden." *Id.* at 2150.

And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11. The tie goes to the Second Amendment claimant. *See also id.* at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend [a statute]").

### C. Analysis.

### 1. Section 922(g)(1) fails *Bruen*'s "text-and-history standard."

Under the framework announced in *Bruen*, § 922(g)(1) violates Canada's Second Amendment right to keep and bear arms. The amendment's "plain text"

does not differentiate between felons and non-felons, and a total prohibition on firearm possession by felons therefore presumptively violates the Second Amendment. The government cannot rebut that presumption. Felons' access to firearms is "a general societal problem that has persisted since the 18th century," and so the government must show a robust tradition of regulations "distinctly similar" to § 922(g)(1). *Id.* at 2131. Felon-disarmament statutes, however, did not appear until the 20th century; the "Founders themselves could have adopted" felon-disarmament laws, but did not do so. *Id.* Because there was no "historical tradition," as of 1791, of regulations "distinctly similar" to § 922(g)(1), that statute violates the Second Amendment. *Id.*

### a. The Second Amendment's "plain text" protects Canada's possession of a firearm.

*Bruen* directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. The answer to that question is easy in Canada's case. The Second Amendment's operative clause contains three textual elements: it protects the right of (1) "the people" to (2) "keep and bear" (3) "Arms." Here, Canada satisfies all three elements.

The indictment alleged Canada possessed a pistol, a handgun. (JA20). According to *Heller*, handguns are "the quintessential self-defense weapon," an item that falls comfortably within the meaning of "Arms" for Second Amendment

15

purposes.  554 U.S. at 629.  Likewise, possessing a handgun, as Canada did, easily qualifies as "keep[ing]" arms.  *Heller* defines "keep" as "to retain; not to lose," "to have in custody," and "to hold; to retain in one's power or possession"—in short, to "have weapons."  *Id.* at 582.

Finally, Canada is part of "the people" protected by the Second Amendment. Just as that amendment does not "draw[] a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2134, it does not draw a felon/non-felon distinction.  "Nothing in the Second Amendment's text" suggests those who have been convicted of a felony are unentitled to the amendment's protection. *Id.*

*Heller* confirms this conclusion.  Construing the words "the people," the *Heller* Court said "the term unambiguously refers to *all* members of the political community, *not an unspecified subset*." *Id.* at 580 (emphasis added).  It interpreted "the people" to refer to all "persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.*  Thus the Second Amendment right "is exercised individually and belongs to *all* Americans." *Id.* at 581 (emphasis added). Interpreting "the people" to exclude felons would conflict with that principle.  It follows that even "dangerous felons" "are indisputably part of 'the people'" for

Second Amendment purposes. *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022); *see also, e.g.*, *United States v. Carrero*, No. 2:22-CR-00030, 2022 WL 9348792, at *2 (D. Utah Oct. 14, 2022) (holding, post-*Bruen*, that felons are among "the people" safeguarded by the Second Amendment); *United States v. Coombes*, No. 22-CR-00189-GKF, 2022 WL 4367056, at *4 (N.D. Okla. Sept. 21, 2022) (same).

In addition, *Heller* explained that "the people" is a "term of art" that bears a uniform meaning across the First, Second, Fourth, and Ninth Amendments. *Id.* at 580. The result is that, if a felony conviction deprives someone of his Second Amendment right to bear arms, it would also deprive him of his First Amendment rights to speak about matters of public concern and worship according to his faith, and his Fourth Amendment right to be free from warrantless searches of his home. Canada is unaware of any court that has ever endorsed that proposition. *See, e.g.*, *United States v. Perez-Gallan*, No. PE:22-CR-00427-DC, 2022 WL 16858516, at *9 (W.D. Tex. Nov. 10, 2022) (striking down 18 U.S.C. § 922(g)(8), which bars firearm possession by people subject to intimate-partner restraining orders, and explaining that because such people "may invoke the protections of [the First and Fourth Amendments]," they may also invoke the protections of the Second); *United States v. Meza-Rodriguez*, 798 F.3d 664, 670-71 (7th Cir. 2015) (concluding "the term 'the

17

people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights" and therefore should be interpreted "as consistent with the other amendments passed as part of the Bill of Rights," such as the First and Fourth Amendments).

Notwithstanding this straightforward interpretation of the Second Amendment's "plain text," the government argued below that "the people" comprises only *law-abiding* people. (JA69-70). This argument derives from a comment *Heller* made when determining the proper standard of review for Second Amendment claims. In rejecting the "interest-balancing inquiry" proposed by Justice Breyer's dissent, the *Heller* majority explained that the Second Amendment "is the very *product* of an interest balancing by the people." *Id.* at 634-35 (emphasis in original). Judges therefore lack authority to "conduct [that balancing] anew" or "decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* (emphasis in original). And regardless, the Court wrote, "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. This latter sentence, the argument goes, limits the right to keep and bear arms to "law-abiding, responsible citizens."

This argument misreads *Heller*. By beginning the quoted passage with "whatever else it leaves to future evaluation," the *Heller* Court made clear that its reference to "law-abiding, responsible citizens" established a Second Amendment floor, not a ceiling. The Court held that law-abiding, responsible citizens have a right to possess firearms, but it did not address whether—much less rule out the conclusion that—other people have that right, too. Rather, it expressly left that question "to future evaluation." *Id. Heller*'s "law-abiding" statement was not meant to amend, sub silentio, its holding that "the people" are all members of the national community, and "not an unspecified subset." *Id.* at 580.

As the Sixth Circuit has put it, *Heller* "conclusively established [that] the Second Amendment applies to law-abiding and peaceable citizens *at the very least*." *Stimmel v. Sessions*, 879 F.3d 198, 204-05 (6th Cir. 2018) (emphasis added). *Heller*'s "law-abiding" language does not "demarcate [the Second Amendment's] outer limit" or "exclude[]" anyone from the amendment's coverage, *id.*; it merely establishes that certain people do fall within the amendment's reach. *See Perez-Gallan*, 2022 WL 16858516, at *8 (explaining *Heller* "defined 'the people' as 'members of the political community,' not 'law-abiding, responsible citizens'").

*Heller*'s qualifying language is clear, but to the extent it was ambiguous, *Bruen* dispelled the ambiguity. The passage cited above references law-abiding,

responsible citizens' right to use arms "in defense of hearth and home." If that passage were meant to mark off the outer edges of the Second Amendment right, then even law-abiding, responsible citizens would have no right to use firearms *outside* the home. But *Bruen* held the Second Amendment right does extend outside the home, and the Court in *Bruen* gave no hint it believed it was contradicting *Heller* in that regard. Thus *Bruen* confirms that it would be a mistake to read *Heller*'s "law-abiding, responsible citizens" language as a limitation on the Second Amendment.

In the district court, the government argued *Bruen* supports its view that Second Amendment rights are "limited" to law-abiding citizens. (JA69-70). It is true that at several points, *Bruen* describes its holding by using the term "law-abiding." *See, e.g.*, 142 S. Ct. at 2156 ("New York's proper-cause requirement violates the [Second] Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."). But *Bruen* repeated the "law-abiding" appellation because the petitioners in that case alleged, "[a]s set forth in the pleadings below," that they were "law-abiding, adult citizens," and the Court granted certiorari to decide only whether "New York's denial of *petitioners'* license applications violated the Constitution." *Id.* at 2124-25 (emphasis added). No other questions were before the Court in *Bruen*, and at no

20

point did the Court say Second Amendment rights are limited to law-abiding citizens.

To the contrary, *Bruen* reaffirmed *Heller*'s conclusion that the Second Amendment right belongs to "'*all* Americans.'" *Id.* at 2156 (emphasis added) (quoting *Heller*, 554 U.S. at 581). That statement cannot be reconciled with the government's view that *Bruen* (implicitly) limits the arms right to law-abiding citizens. *Bruen* also repeated *Heller*'s instruction that courts should give "the Second Amendment's language" its "'normal and ordinary' meaning." *Id.* at 2127 (quoting *Heller*, 554 U.S. at 576). There is nothing normal or ordinary about reading "the people" to mean "*law-abiding* people." And anyway, the government's argument proves too much. *Bruen* held "that *ordinary*, law-abiding citizens have [the] right to carry handguns publicly for their self-defense." *Id.* at 2122 (emphasis added). If the word "law-abiding" in that sentence limits the Second Amendment's scope, then the word "ordinary" must do so, too. But surely the government does not believe *un*ordinary citizens lack Second Amendment rights. It cannot be that the Supreme Court meant to exclude anyone deemed abnormal—a term with no discernible meaning—from exercising a fundamental, enumerated constitutional right. Limiting the Second Amendment by negative implication is equally unjustified regarding "law-abiding."

21

Canada, who is an American citizen, is part of the United States' "national community." *Heller*, 554 U.S. at 580. He is therefore among "the people" protected by the Second Amendment.

> **b.  The government did not show—and will be unable to show—that § 922(g)(1) is consistent with the United States' "historical tradition of firearm regulation."**

Because "the Second Amendment's plain text covers [Canada's] conduct, the Constitution presumptively protects that conduct." *Bruen*, at 2126. To rebut the presumption, the government must establish that § 922(g)(1) "is consistent with this Nation's historical tradition of firearm regulation." *Id.* The government failed to do so below and cannot do so before this Court.

> **i.  There is no tradition of statutes "distinctly similar" to § 922(g)(1).**

The threshold question in *Bruen*'s historical inquiry is whether the problem addressed by § 922(g)(1) is longstanding or of more recent provenance. The answer is clear: the "general societal problem" at which § 922(g)(1) is directed—i.e., felons' access to guns—"has persisted since the 18th century." *Id.* at 2131. As a result, § 922(g)(1) is unconstitutional unless the government shows a robust tradition of "distinctly similar" regulations as of 1791, when the Second Amendment was ratified. *Id.* The government cannot defend § 922(g)(1) through "analogical

reasoning" and the "relevantly similar" test, which are reserved for statutes aimed at "unprecedented" problems that would have been "unimaginable" at the founding. *Id.* at 2132. After all, the potential danger posed by felons' access to firearms would hardly have been foreign to the Founders.

The government did not even attempt to carry its burden in district court. Canada's motion to dismiss explained that *Bruen* established dual-track review of historical evidence: a "distinctly similar" test for statutes aimed at longstanding problems, and a "relevantly similar" test for statutes directed to "unprecedented" problems. (JA30-31). He further explained that, because felons' access to firearms "has persisted since the 18th century," *Bruen*, 142 S. Ct. at 2131, the government had to satisfy the "distinctly similar" standard, not the "relevantly similar" standard. (JA34-37). In its response, the government did not dispute that the standard for reviewing historical evidence varies depending on whether a statute addresses an old or a new problem. Nor did it deny that felons' access to firearms has been a (potential) problem since at least 1791. (*See* JA63-74). Instead, the government simply skated past the "distinctly similar" requirement and sought to carry its burden by arguing § 922(g)(1) was "sufficiently analogous" to historical precursors. (JA68).

Even assuming the government has not abandoned any argument that it can satisfy the "distinctly similar" test, it will be unable to do so on appeal. Although *Bruen* did not expressly define "distinctly similar," it indicated the standard is a stringent one. The only historical regulation *Bruen* identified as sufficiently similar to New York's proper-cause requirement was an 1871 Texas law forbidding "anyone from 'carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing an unlawful attack on his person.'" *Id.* at 2153 (citing 1871 Tex. Gen. Laws § 1). This "reasonable grounds" requirement was essentially identical to New York courts' interpretation of that state's proper-cause standard. *See id.* at 2123-24 & n.2. In a challenge to § 922(g)(1), then, a "distinctly similar" historical regulation would be one that either denied or substantially abridged *felons'* access to firearms. But no such statutes appear in the 18th- or 19th-century record.

What is today § 922(g)(1) traces its origins to 1938, when Congress passed the Federal Firearms Act, prohibiting certain felons from receiving firearms. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing c. 850, § 2(f), 52 Stat. 1250, 1251 (1938)). At that time, the statute "covered only a few violent offenses," *id.*, prohibiting receipt of a firearm by those convicted of crimes such as murder, rape, kidnapping, and burglary, *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011). Not until 1961 did Congress amend the statute to cover receipt by

24

"*all* felons." *Skoien*, 614 F.3d at 640 (emphasis in original) (citing Pub. L. 87–342, 75 Stat. 757). Seven years later, "Congress changed the 'receipt' element of the 1938 law to 'possession,' giving 18 U.S.C. § 922(g)(1) its current form." *Id.*

Section § 922(g)(1) "is firmly rooted in the twentieth century," *Booker*, 644 F.3d at 24—roughly 150 years after adoption of the Second Amendment. The Court in *Bruen* said it would not even "address any of the 20th-century historical evidence brought to bear by respondents or their *amici*," since evidence of that type "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28. Regulations of such recent vintage cannot establish a historical tradition unless they "confirm[]" earlier practice. *Id.* at 2137.

Here, they do not. Section 922(g)(1) "bears little resemblance to laws in effect at the time the Second Amendment was ratified." *N.R.A. v. A.T.F.*, 700 F.3d 185, 196 (5th Cir. 2012). In 2007, Robert H. Churchill, a history professor at the University of Hartford, undertook "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 143 & n.11 (2007). Based on that survey, Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police

power to restrict the ownership of guns by members of the body politic." *Id.* at 142. Carlton Larson, a professor at the University of California-Davis School of Law, has written that, "[a]s far as [he] can determine, state laws prohibiting felons from possessing firearms or denying firearms licenses to felons date from the early part of the twentieth century." Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60 Hastings L.J. 1371, 1376 (2009).

Other scholars agree. Although it is difficult "to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 708 (2009). It appears New York became the first state to enact such a ban, when in 1917 it made a felony conviction a basis for revoking a concealed-weapon permit. *Id.* No other state passed a felon-disarmament law until 1923. *Id.*; *see also* Adam Winkler, Heller*'s Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (similar); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187, 1211 (2015) (similar).

In short, there was no "historical tradition," circa 1791, of gun regulations "distinctly similar" to § 922(g)(1). *Bruen*, 142 S. Ct. at 2130-31. The "Founders themselves could have adopted" laws like § 922(g)(1) to "confront" the "perceived societal problem" posed by felons' access to guns. *Id.* at 2131. But they declined to do so, and that inaction indicates § 922(g)(1) "[i]s unconstitutional." *Id.*

> ## ii. Founding-era militia statutes confirm that felons enjoyed the right to keep and bear arms.

That the historical record reveals no statutes "distinctly similar" to § 922(g)(1) is dispositive under *Bruen*. But to the extent the Court needs additional evidence of § 922(g)(1)'s unconstitutionality, it can be found in colonial and early-republic militia statutes.

*Heller* concluded "the Second Amendment's prefatory clause"—i.e., "A well regulated Militia, being necessary to the security of a free State"—"announces the purpose for which the right was codified: to prevent elimination of the militia." 554 U.S. at 599. Given this "stated purpose, logic demands that if an individual was (or is) a member of the 'militia,' the Second Amendment's protections extend at least to those who constitute the militia." *Firearms Pol'y Coal., Inc. v. McCraw*, ___ F. Supp. 3d ___, 2022 WL 3656996, at *5 (N.D. Tex. Aug. 25, 2022). "That is, although the Second Amendment is not limited to only those in the militia, it must

27

protect at least the pool of individuals from whom the militia would be drawn." *Id.*
As of 1791, that pool included felons.

*Heller* defined the militia as "all males physically capable of acting in concert
for the common defense," 554 U.S. at 595, and statutory law from the founding era
demonstrates that "all males" encompassed felons.  In the first Militia Act, enacted
one year after the Second Amendment's ratification, Congress provided that "each
and every free able-bodied white male citizen of the respective states, resident
therein, who is or shall be of the age of eighteen years, and under the age of forty-
five years . . . shall severally and respectively be enrolled in the militia."  Act of May
8, 1792, § 1, 1 Stat. 271.  The Act further stipulated that "every citizen so enrolled
. . . shall, within six months thereafter, provide himself with a good musket or
firelock, a sufficient bayonet and belt," and various other firearm accoutrements,
including ammunition.  *Id.*  Although the Act "exempted" certain classes of people
from these requirements (e.g., "all custom-house officers," "all ferrymen employed
at any ferry on the post road"), felons were not among them.  *Id.* § 2, 1 Stat. 272.  At
least eight state militia statutes, passed shortly before or after 1791, contained similar
requirements, and similarly did not exempt felons.[1]

---

[1] *See* Laws of the State of Delaware, ch. XXXVI, §§ 1, 2, 4, at 1134-36
(1797); Public Statute Laws of the State of Connecticut, Title CXII, ch. I, §§ 1,
10, at 499-500, 505-06 (1808); Herty, Digest of the Laws of Maryland, "Militia,"
§§ 7, 15, 19, 20, at 367-70 (1799); Wright & Potter, 7 Acts and Laws of the

28

As these acts show, felons in the founding era not only were *permitted* to possess firearms, they actually were legally *required* to do so. Given this legal obligation, holding that felons lack Second Amendment rights would be textually and historically untenable. *See McCraw*, 2022 WL 3656996, at *5 ("It would be illogical to enumerate a constitutional right to keep and bear arms to maintain an armed militia if that right did not protect those individuals from whom a militia would be drawn.").

> iii. **The government cannot shoulder its burden by pointing to statutes that disarmed supposedly "dangerous" or "unvirtuous" groups.**

In district court, the government argued § 922(g)(1) "fits comfortably within the nation's longstanding tradition of disarming unvirtuous or dangerous citizens." (JA71). This effort to discharge the government's burden is flawed in at least two respects: (1) it ignores *Bruen*'s teaching that limits on the Second Amendment right

---

Commonwealth of Massachusetts, 1780-1805, ch. 14, at 381-82, 389-90 (1898); Constitution and Laws of the State of New-Hampshire, Act of Dec. 28, 1792, at 251-52, 256 (1805); Thomas Greenleaf, Laws of the State of New-York, Act of April 4, 1786, at 227-28, 232-33 (1792); Mitchell, Statutes at Large of Pennsylvania, Act of March 20, 1780, §§ III, XXI, at 146, 154 (1700-1809); Marbury, Digest of the Laws of the State of Georgia, Act of December 24, 1792, §§ 9-10, at 350 (1802).

These statutes are not available on Westlaw or similar databases. Canada is happy to provide copies in a supplemental filing if they would assist in the Court's decision-making.

must be grounded in firearm "regulations," and (2) it defines the relevant historical tradition at far too high a level of generality.

> ### (a) *Bruen* requires a focus on firearm "regulations" having the force of law.

To rebut the presumption of unconstitutionality under *Bruen*, the government must bring forward evidence showing "a well-established and representative" tradition of laws prohibiting certain conduct. *Id.* at 2133. Critically, that tradition must be reflected in rules and prohibitions having the force of law. Over and over, *Bruen* stressed that the proper question in Second Amendment analysis is whether a challenged statute is consistent with the American tradition of firearms "regulation," i.e., positive law, laid out in statute books or judicial decisions, that affirmatively prohibited particular conduct. *See, e.g.*, *id.* at 2126 ("[T]he government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm *regulation*."); *id.* at 2130 ("The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm *regulation*."); *id.* at 2131-32 ("[W]e will consider whether historical precedent from before, during, and even after the founding evinces a comparable tradition of *regulation*."); *id.* at 2135 ("[T]he burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm *regulation*.").

In assessing New York's proper-cause requirement, *Bruen* did not inquire into "general Founding-Era attitudes" about firearm use. *McCraw*, 2022 WL 3656996, at *7. It did not ask what political philosophers of the 1790s would have said about the right to bear arms, or how late-18th-century intellectual currents conceptualized that right.

Instead, the Court asked a much more concrete, empirical question: did founding-era governments "regulate" firearms—that is, proscribe their possession or use by law—in the same way as New York's statute? Answering this question required looking to "regulations" (i.e., laws) in force—not vague, abstract theorizing about how people of the founding era viewed firearms. *See, e.g.*, *Bruen*, 142 S. Ct. at 2142 ("[T]here is little evidence of an early American practice of *regulating* public carry by the general public."); *id.* ("[W]e doubt that three colonial regulations could suffice to show a tradition of public-carry *regulation*."); *id.* at 2150 ("The historical evidence from antebellum America does demonstrate that the manner of public carry was subject to reasonable *regulation*."); *id.* at 2152 ("As for Reconstruction-era state *regulations*, there was little innovation over the kinds of public-carry restrictions that had been commonplace in the early 19th century."); *id.* at 2154 ("These territorial legislative improvisations, which conflict with the Nation's earlier approach to firearm *regulation*, are most unlikely to reflect the origins and continuing

31

significance of the Second Amendment and we do not consider them instructive."); *id.* at 2155 ("Thus, [territorial statutes] appear more as passing regulatory efforts by not-yet-mature jurisdictions on the way to statehood, rather than part of an enduring American tradition of state *regulation*.").

The government's district-court briefing utterly failed to meet *Bruen*'s standard. To support its "dangerous" and "unvirtuous" theories, the government did not cite even a single historical regulation proscribing firearm use. (*See* JA69-74). Unlike *Bruen*—which scrutinized the text and judicial interpretations of numerous specific statutes—the government relied entirely on sweeping, unparticularized characterizations of the historical record found in secondary sources, such as books, law review articles, and court opinions. (*See, e.g.*, JA72 ("The Second Amendment incorporates a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible and does not preclude laws disarming the unvirtuous (i.e. criminals)."); and JA71 ("[T]he Anglo-American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous.")). That 30,000-foot view of history does not pass muster under *Bruen*, which requires courts to descend into particulars.[2]

---

[2] The closest the government came to identifying an actual, in-force legal proscription is a footnote that cited a D.C. Circuit opinion explaining that during the American Revolution, "Massachusetts and Pennsylvania confiscated weapons belonging to those who would not swear loyalty to the United States." JA73. But

If the government wants to carry its burden in this Court, it must do what *Bruen* demands: cite specific statutes (identified by jurisdiction and year of passage) and show that, rather than being "outliers," those statutes add up to a "well-established and representative" historical tradition. *Id.* at 2133. Vague allusions to what "the founders" or "some colonies" or "several states" did, backed up only by academics' gloss on the historical record, are not enough; under *Bruen*, that doesn't cut it.

**(b)   The "dangerous" and "unvirtuous" theories are insufficiently particular.**

To the extent the secondary sources in the government's district-court briefing substantiate their claims with historical regulations, they identify a handful of colonial and early-republic statutes that made it illegal for slaves, Native Americans, and certain religious minorities to possess firearms and a few statutes that conditioned firearm rights on citizens' willingness to swear a loyalty oath to the state. (*See* JA69-74, citing secondary sources). Based on these disparate regulations of discrete groups, the secondary sources deduce a broader principle: that the Second Amendment, as it was understood in 1791, did not protect members of *any* group considered "dangerous" or "unvirtuous," even if that specific group was never

---

the government did not even quote these regulations, much less provide citations for them so the district court could subject them to the kind of rigorous historical inquiry mandated by *Bruen*.

disarmed at the founding. Therefore, these sources conclude, statutes like § 922(g)(1)—which disarms supposedly "dangerous" and "unvirtuous" felons—are constitutional because they are similar to founding-era laws that prohibited the dangerous and unvirtuous from possessing firearms.

This argument operates at too high a level of generality. *Bruen* demonstrates that in carving out exceptions to "the Second Amendment's unqualified command," *id.* at 2126, courts should proceed cautiously, defining those exceptions narrowly and concretely, to ensure they are in fact consistent with America's historical tradition of firearm regulation.

To support its proper-cause requirement, New York relied on several English and early American firearms regulations that, in its view, demonstrated a general governmental power to regulate the public carrying of firearms. The Court, however, refused to treat those regulations as more than the sum of their parts. Although New York's cited regulations suggested the constitutionality of certain narrow, "well-defined" public-carry restrictions, the Court concluded they did not permit "broadly prohibiting" public carry in whatever way a legislature finds appropriate. *Id.* at 2138. New York could not derive a general, far-reaching power to proscribe public carry simply by cobbling together a handful of discrete, targeted laws that regulated public carry in limited and specific ways.

34

First, New York cited the 1328 Statute of Northampton, which "provided that, with some exceptions, Englishmen could not 'come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere.'" *Id.* at 2139 (quoting 2 Edw. 3 c. 3 (1328)). New York pointed as well to colonial and early-republic statutes prohibiting similar conduct. *Id.* at 2142-46. According to New York, these regulations demonstrated a "sweeping" governmental power to restrict public carry. *Id.* at 2139. But the Court read the regulations as prohibiting only "bearing arms in a way that spreads 'fear' or 'terror' among the people." *Id.* at 2145. And because those regulations prohibited only one particular manner of public carry, *id.* at 2143, they did not establish that the Second Amendment "permit[s] *broad* prohibitions on *all* forms of public carry," *id.* at 2145 (emphasis added).

In addition, New York cited several statutes from "the early to mid-19th century" that "proscribed the concealed carry of pistols and other small weapons" in public. *Id.* at 2146. New York argued these statutes demonstrated that states may "ban public carry altogether." *Id.* But again, the Court refused to endorse such a far-reaching reading of the historical record. State courts interpreting those

35

statutes had held "concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry." *Id.* (emphasis in original). And the *Bruen* Court declined to conclude, based on the permissibility of restricting one "particular mode" of public carry (concealed), that states may enact a "*general* prohibition" on *all* modes of public carry (both concealed and open). *Id.* at 2146-47 & n.19 (emphasis added).

Finally, New York analogized its proper-cause requirement to mid-19th-century "surety statutes." *Id.* at 2148. Those statutes provided that if someone carried a firearm in public and thereby placed others in reasonable fear of injury, he would have to "post a bond before publicly carrying a firearm" again, unless he could show he had "reasonable cause to fear an assault or other injury." *Id.* The Court rejected the comparison. Under surety statutes, "everyone started out with robust carrying rights and only those reasonably accused were required to show a special need in order to avoid posting a bond." *Id.* at 2149. New York's regime, by contrast, "presume[d] that individuals have *no* public carry right without a showing of heightened need." *Id.* at 2148 (emphasis in original). From the fact that states may "provide financial incentives for responsible" public carry, the Court refused to conclude that other, historically unprecedented public-carry restrictions are permissible. *See id.* at 2150.

36

And the Court held that, even in the aggregate, these regulations did not add up to a historical tradition of "broadly prohibit[ing]" all forms and manners of public carry. The Court's historical survey revealed a few "well-defined" restrictions on public carry: those that limited "the intent for which one could carry arms" (to terrorize the people), "the manner of carry" (concealed vs. open), and "the exceptional circumstances under which one could not carry arms" (if a surety statute applied). *Id.* at 2138. But that's all. New York could not extrapolate, from these specifics, a general power to regulate public carry more broadly.

*Bruen* made the same point in its discussion of "sensitive places" where firearms may be "altogether prohibited." *Id.* at 2133. New York argued the sensitive-places doctrine should cover "all 'places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available.'" *Id.* But the Court rejected that conception of the term. "Put simply," the Court explained, "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.* at 2134. Expanding "sensitive places" in that way "defines the category of 'sensitive places' far too broadly." *Id.* According to the Court, such an understanding of

sensitive places "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Id.*

*Bruen* dooms any effort to carve out Second Amendment exceptions for all groups labeled "dangerous" or "unvirtuous." That effort relies on a handful of founding-era statutes disarming specific groups (slaves, Native Americans, certain religious minorities, and disloyal subjects), from which commentators have gleaned the much broader principle that "dangerous" or "unvirtuous" groups, in general, do not enjoy the right to keep and bear arms. This is exactly the maneuver the Court rejected in *Bruen*: identify a few specific examples of conduct that historically has been constitutionally unprotected (e.g., carrying firearms "to terrorize the people," carrying concealed in states where open carry is permitted), move up the level-of-generality ladder to a descriptor that unites these discrete examples (e.g., "public carry"), and then apply that umbrella term to *all* conduct that (arguably) falls in the broader category (e.g., publicly carrying without "proper cause"). *Bruen* forbids the government from abridging fundamental constitutional rights in this way.

In addition, the Second Amendment exceptions that this approach would produce are grossly overbroad. The category of "dangerous" persons is anything but "well-defined." *Bruen*, 142 S. Ct. at 2156. "Dangerous" is an elastic, malleable

38

term that, in the wrong hands, could be applied to virtually any group of people—and "eviscerate" the right to keep and bear arms. *Id.* at 2134; *see Medina v. Whitaker*, 913 F.3d 152, 159-60 (D.C. Cir. 2019) (concluding "'dangerousness' standard" is too "amorphous . . . to delineate the scope of the Second Amendment"); *Kanter v. Barr*, 919 F.3d 437, 465 (7th Cir. 2019) (Barrett, J., dissenting) ("The government could quickly swallow the [Second Amendment] right if it had broad power to designate any group as dangerous and thereby disqualify its members from having a gun."). Employing the "dangerous" designation, for instance, a legislature might seek to disarm supporters of an opposing political party, those with a low IQ or intellectual disability, inhabitants of "high-crime" areas, or anyone who's ever been arrested (though not charged) for any criminal offense, no matter how minor. The term "dangerous," in other words, is the kind of "highly manipulable" metric that the Supreme Court has said governments may not use to circumscribe citizens' fundamental constitutional rights. *See United States v. Stevens*, 559 U.S. 460, 472 (2010) (interpreting First Amendment, to which *Bruen* analogized Second Amendment).

The "unvirtuous" label is even less "well-defined." *Bruen*, 142 S. Ct. at 2138. That term is so pliant, so capacious, the government might use the "virtuousness" theory to disarm a seemingly endless number of groups, from serial

liars to those who cheat on their spouses to anyone who fails to display "courage," "temperance," "wisdom," or "justice."  R. George Wright, *Constitutional Cases and the Four Cardinal Virtues*, 60 Clev. St. L. Rev. 195, 198 (2012).  Whether such laws would pass constitutional muster is anyone's guess; "virtue" is about as expansive, ill-defined a basis for limiting constitutional rights as it's possible to imagine.  That term not only lacks a "*clear* limiting principle," it lacks any limiting principle.  *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (declining to carve out a broad, new category of speech unprotected by the First Amendment) (emphasis added); *see Binderup v. Att'y Gen.*, 836 F.3d 336, 372 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part) ("[I]t is hard to understand what the Government's proposed 'virtuousness' limitation would even require.").

What's more, applying the "dangerous" and "unvirtuous" labels would require precisely the "judge-empowering interest-balancing inquiry" that *Bruen* forbids.  142 S. Ct. at 2129.  If courts are to avoid treating the right to bear arms as "a second-class right," *id.* at 2156, they must scrutinize legislatures' judgments: Is it reasonable to conclude that people with low IQ are dangerous, or that adulterers are unvirtuous?  How important is it, really, to prevent guns from falling into the hands of someone who was briefly arrested for disorderly conduct but then released without charge?  Or someone who is cowardly and intemperate?  Assuming that

40

inhabitants of "high-crime" areas pose *some* minimal danger if allowed to possess guns, could the legislature have written the statutory proscription more narrowly while still achieving the same public-safety benefits?

But this is means-ends balancing all over again—the mode of analysis *Bruen* repudiated. The only way to avoid getting sucked back into that thicket is to conduct the analysis at a lower, more "administrable" level of generality tightly tethered to the historical record. *See id.* at 2130. Instead of asking whether founding-era laws prohibited firearm possession by "dangerous" or "unvirtuous" people—categories broad enough to sweep in almost anyone—the Court must ask whether such laws, like § 922(g)(1), denied firearms to those whose commission of a felony suggested they might pose a danger to others if armed. Any other approach risks embroiling courts in "independent means-end scrutiny under the guise" of a historical comparison. *Id.* at 2133 n.7.

"Dangerousness" and "unvirtuousness" are not proper metrics for parsing the historical record.

### 2.    This Court's pre-*Bruen* cases do not resolve Canada's Second Amendment claim.

Below, the government argued *Bruen* did not disturb this Court's post-*Heller* cases upholding § 922(g)(1). (JA8). That view is mistaken. Understanding why requires some background.

After completing its historical survey, and before assessing the constitutionality of the District of Columbia's statutes, the Court in *Heller* inserted some "precautionary language." *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 688 (6th Cir. 2016) (en banc). It wrote that the Second Amendment right "is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. The Court elaborated:

> For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-27. In an accompanying footnote, the Court described these prohibitions as "presumptively lawful regulatory measures." *Id.* at 627 n.26.

Following *Heller*, this Court in *Chester* laid out its two-step, means-ends inquiry for Second Amendment claims. 628 F.3d at 680-83. That case involved 18 U.S.C. § 922(g)(9), which makes it illegal to possess a firearm after conviction for a "misdemeanor crime of domestic violence." *Id.* at 677. Two years later, in *United States v. Moore*, 666 F.3d 313, 315 (4th Cir. 2012), this Court for the first time

42

addressed a Second Amendment challenge to a statute—§ 922(g)(1)—that is among the "presumptively lawful regulatory measures" identified in *Heller*.

*Moore* noted that *Heller* said "'nothing in [that] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons,'" which *Heller* characterized as "'"presumptively lawful regulatory measures."'" *Id.* at 317-18. The *Moore* Court expressed confusion about this aspect of *Heller*, observing that it was "unclear . . . whether *Heller* was suggesting that 'longstanding prohibitions' such as these [firearm possession by felons] were historically understood to be valid limitations on the right to bear arms or did not violate the Second Amendment for some other reason." *Id.* at 318. But the Court felt no need to resolve that question. Because "the presumption of constitutionality . . . govern[ed]," the Court did "not pursue an analysis of the historical scope of the Second Amendment right," as it otherwise would have at *Chester*'s step one. *United States v. Pruess*, 703 F.3d 242, 246 n.3 (4th Cir. 2012) (discussing *Moore*). Instead, it simply concluded "the *Chester* analysis is more streamlined when a presumptively lawful regulatory measure is under review." *Moore*, 666 F.3d at 318. Specifically, *Moore* held *Heller*'s reference to "presumptively lawful" felon-disarmament laws "negates a facial challenge to a felon in possession statute like § 922(g)(1)." *Id.*

43

This conclusion rested solely on the "presumptively lawful" passage in *Heller*; it was not rooted in a *Chester*-step-one determination that felons are outside "the scope of the Second Amendment as historically understood." 628 F.3d at 680; *see Hamilton v. Pallozzi*, 848 F.3d 614, 624 (4th Cir. 2017) ("The streamlined portion of the analysis as explained in *Moore* is that for a presumptively lawful regulation, at the first step of the Second Amendment inquiry, we need not undertake an extensive historical inquiry to determine whether the conduct at issue was understood to be within the scope of the Second Amendment at the time of ratification."). *Bruen* clarifies, however, that uncritical deference to *Heller*'s "presumptively lawful" language is no longer proper.

In the sentence before its reference to "longstanding prohibitions" on felons' possession of firearms, the *Heller* Court wrote that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Heller*, 554 U.S. at 626. Fourteen years later, the Court in *Bruen* confronted a challenge to a New York law severely restricting the concealed carry of firearms in public. *Bruen*, 142 S. Ct. at 2122-23. If *Heller*'s casual description of concealed-carry bans as constitutional were dispositive, *Bruen* would have been an easy case: the Court would simply have

44

deferred to *Heller*'s approval of such laws and upheld New York's statute on that basis.

But that is not what the Court did. It instead undertook an exhaustive historical survey of the law governing concealed carry, from medieval England up to late-19th-century America. *Id.* at 2135-56. And "[a]t the end of th[at] long journey through the Anglo-American history of public carry," *id.* at 2156, the Court reached a conclusion different from its offhand remark in *Heller*, holding that laws burdening concealed carry are *un*constitutional, at least where the state also forbids open carry. *See id.* at 2144-47, 2150 (acknowledging *Heller*'s statement that concealed-carry bans are lawful, but adding, "[i]n fact, however, the history reveals a consensus that States could *not* ban public carry altogether" (emphasis in original)). In short, *Bruen* concluded *Heller*'s historical account did not settle the question of the proper-cause requirement's constitutionality.

Concealed-carry bans, like felon-disarmament laws, fall in *Heller*'s category of "presumptively lawful regulatory measures." *See United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012) ("*Heller* lists several examples of what the Court deemed to be 'presumptively lawful regulatory measures,' including prohibitions on carrying concealed weapons."). *Bruen* therefore holds an obvious lesson for § 922(g)(1). Rather than treating *Heller*'s "presumptively lawful" passage as

45

dispositive, this Court must actually investigate the historical record to determine whether felon-disarmament laws are in fact consistent with the Second Amendment. If anything, the need for historical inquiry is even greater regarding felon-disarmament laws than it was regarding concealed-carry bans in *Bruen*. *Heller* seemingly blessed the constitutionality of concealed-carry prohibitions by citing four sources—two cases and two treatises. 554 U.S. at 626. For felon-disarmament laws, by contrast, it cited no sources. *Id.* at 626-27. If the four sources supporting concealed-carry bans could not stave off a fuller historical analysis in *Bruen*, then it follows that *Heller*'s authority-free approval of felon-disarmament laws does not end the inquiry.

The *Bruen* Court had good reason to feel unconstrained by *Heller*'s reference to "presumptively lawful regulatory measures." Those measures' constitutionality was not before the Court in *Heller*, and any statements in the opinion addressing that question were therefore "dicta." *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *accord Tyler* at 686-87 (describing *Heller*'s "presumptively lawful" language as "dictum"); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (same). As the Court recognized in *Bruen*, *Heller* did not settle any questions beyond those necessary to resolve the petitioner's claim. *Id.* at 2128 (noting *Heller* described Second Amendment right as "not unlimited," but adding, "That said, we

cautioned that we were not 'undertak[ing] an exhaustive historical analysis today of the full scope of the Second Amendment' and moved on to considering the constitutionality of the District of Columbia's handgun ban").

*Heller*'s "presumptively lawful" dictum, moreover, was "'cursory'" and—at best—"'peripheral'" to the question presented. *Hengle v. Treppa*, 19 F.4th 324, 347 (4th Cir. 2021) (quoting discussion in *Payne v. Taslimi*, 998 F.3d 648, 654–55 (4th Cir. 2021), of when "dictum is not binding"). While *Heller* described its "presumptively lawful regulatory measures" as "longstanding," 554 U.S. at 626 & n.26, it "never actually addressed the historical pedigree" of those laws, *Kanter*, 919 F.3d at 445. The Court simply asserted such laws were longstanding, and therefore presumptively lawful, "without any reasoning or explanation." Winkler, 56 U.C.L.A. L. Rev. at 1567; *see Chester* at 679 ("*Heller* described its exemplary list of 'longstanding prohibitions' as 'presumptively lawful regulatory measures' without alluding to any historical evidence that the right to keep and bear arms did not extend to felons, the mentally ill or the conduct prohibited by any of the listed gun regulations."). Treating that perfunctory historical analysis as determinative would have conflicted with *Bruen*'s central lesson: that history—distilled through an intensive, painstaking engagement with primary sources—is paramount in

47

Second Amendment interpretation. It is unsurprising, then, that *Bruen* did not repeat *Heller*'s "presumptively lawful" dictum.

By choosing not to be bound by that dictum, *Bruen* merely walked through a door *Heller* left open. Dissenting in *Heller*, Justice Breyer criticized the opinion's discussion of "presumptively lawful regulatory measures" as "*ipse dixit*," noting that the majority "fail[ed] to cite any colonial analogues" to such statutes. *Id.* at 721-22. The majority responded there would "be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.* at 635. This rejoinder suggests the *Heller* Court "presum[ed]" it would find those regulatory measures lawful—but only if they are consistent with history and tradition. The Court's allusion to "expound[ing] upon the historical justifications" for presumptively lawful regulatory measures would make no sense if the Court believed those laws were lawful *regardless* of what the historical record showed. *Compare Heller*, 554 U.S. at 625 n.25 ("It is inconceivable that we would rest our interpretation of the basic meaning of any guarantee of the Bill of Rights upon . . . a footnoted dictum in a case where the point was not at issue and was not argued."), *with id.* at 627 n.26 (stating in footnoted dictum, in case where the point was not at issue and was not argued, that concealed-carry bans and felon-disarmament laws are "presumptively lawful" under the Second Amendment).

Lower courts "are not bound by dicta or separate opinions of the Supreme Court," *Myers v. Loudoun Cty. Pub. Sch.*, 418 F.3d 395, 406 (4th Cir. 2005), especially when those dicta have been "enfeebled by later statements" in other Supreme Court cases, *Hengle*, 19 F.4th at 347. Here, *Bruen* more than "enfeebled" *Heller*'s "presumptively lawful" dictum; it made plain that courts should not permit that dictum—unexplained and unsupported as it was—to foreclose a full historical inquiry.[3] Thus this Court's opinion in *Moore*, which rejected a facial Second Amendment challenge to § 922(g)(1) based solely on *Heller*'s "presumptively lawful" dictum, no longer controls. *See United States v. Banks*, 29 F.4th 168, 175 (4th Cir. 2022) ("[W]e need not follow precedent by a panel or by the court sitting en banc if the decision rests on authority that subsequently proves untenable considering Supreme Court decisions. Authority is untenable if its reasoning or holding is inconsistent with a Supreme Court decision.").

### 3. The mandate rule did not bar consideration of Canada's motion to dismiss.

The government urged the district court to reject Canada's dismissal motion because it was barred by the mandate rule. (JA63-64). The district court rightly disregarded this argument. (JA91).

---

[3] As to felon-disarmament laws, that dictum was not just unexplained, but factually erroneous. No American jurisdiction enacted such a law until the 20th century, *see supra*, Part I.C.1.b.i., and so those laws are in fact not "longstanding"— at least not in the sense that *Bruen* would use that term.

The mandate rule "forecloses litigation of issues decided by the district court but foregone on appeal or otherwise waived, for example because they were not raised in the district court." *Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co.*, 510 F.3d 474, 481 (4th Cir. 2007). Under the rule, "any issue that could have been but was not raised on appeal is waived and thus not remanded." *United States v. Pileggi*, 703 F.3d 675, 679 n.4 (4th Cir. 2013). Relevant here, however, district courts may deviate from the mandate when (1) "controlling legal authority has changed dramatically" or (2) "a blatant error in the prior decision will, if uncorrected, result in a serious injustice." *Doe v. Chao*, 511 F.3d 461, 467 (4th Cir. 2007).

***First,*** *Bruen* is a "transformative" and "paradigm shifting" decision with "vast" "ramifications." *United States v. Young*, No. CR 22-054, 2022 WL 16829260, at *1, 3 (W.D. Pa. Nov. 7, 2022). It appears all this Court's prior Second Amendment cases relied either on interest-balancing at *Chester* step two or on *Heller*'s "presumptively lawful" dictum. But *Bruen* rejected both those modes of analysis and directed courts instead to rely only on "text and history." *Id.* at 2129. *Bruen* is a watershed opinion that requires reconsideration of this Court's post-*Heller* precedents. Where the law has changed so dramatically, the mandate rule does not apply. *See United States v. Robinson*, 390 F.3d 833, 837 (4th Cir. 2004) (holding mandate rule inapplicable because intervening Supreme Court decision

"altered the controlling [legal] principles" and "constituted a dramatic intervening change from [this Court's prior] decision in [another case]"), *cert. granted and judgment vacated on different grounds*, 544 U.S. 971 (2005).

**Second,** Canada was sentenced to 220 months' imprisonment solely for violating § 922(g)(1). If, as he argues, the conduct for which he was convicted is constitutionally protected, requiring him to serve over 18 years in prison would "result in a serious injustice." *Doe*, 511 F.3d at 467.

## II. The district court erred in holding CDV 3rd is an ACCA predicate violent felony.

### A. Standard of review

"Whether a prior offense is an ACCA violent felony is a question of law that [this Court] review[s] de novo." *United States v. Hemingway*, 734 F.3d 323, 331 (4th Cir. 2013)

### B. Legal background

#### 1. The ACCA and the categorical approach.

A conviction under § 922(g)(1) ordinarily carries a statutory maximum of ten years imprisonment. *United States v. Vann*, 660 F.3d 771, 772 (4th Cir. 2011)(en banc). But under the ACCA, the penalty increases to a minimum of 15 years imprisonment, with a maximum of life, if a defendant has three prior convictions "for a violent felony or a serious drug offense, or both." 18 U.S.C. § 924(e)(1). A

"violent felony," under the ACCA's "force clause," is any crime, punishable by more than a year in prison, which "has as an element the use, attempted use, or threatened use of physical force against the person of another." "[P]hysical force" means "*violent force* - that is, force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010) (emphasis in original).

The categorical approach determines whether a conviction qualifies as an ACCA predicate offense. *Taylor v. United States*, 495 U.S. 575, 600–02 (1990); *see also United States v. Proctor*, 28 F.4th 538 (4th Cir. 2022). "Under this approach, [courts] examine only the elements of the state offense and the fact of conviction, not the defendant's conduct." *Id.* at 545. "Once the elements of the offense are identified, [courts] rely on state-court decisions to determine the *minimum* conduct needed to commit the offense." *Id.* (emphasis in the original). "When evaluating a state court conviction for ACCA predicate offense purposes, a federal court is bound by the state court's interpretation of state law." *United States v. Drummond*, 925 F.3d 681, 689 (4th Cir. 2019). The federal court must presume the defendant's prior conviction "rested upon [nothing] more than the least act criminalized…" by the statute of conviction. *Moncrieffe v. Holder*, 569 U.S. 184, 190-91 (2013).

In *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004), the Supreme Court held that the use of force in an ACCA predicate crime of violence must be intentional, requiring "active employment, and a higher degree of intent than negligent or merely accidental conduct." In *Borden*, a plurality of the Supreme Court reemphasized *Leocal*, holding that the force clause does not include offenses which criminalize reckless conduct. 141 S. Ct. at 1825. An offense cannot be an ACCA predicate violent felony unless it necessarily requires that when the defendant acted, he made a "deliberate choice [to use force] with full awareness of [the] consequent harm." *Id.* at 1835 (Thomas, J., concurring in the judgment). The *Borden* plurality held that the ACCA does not reach the individual who intentionally engages in forceful conduct when he does so merely in conscious disregard of "a substantial and unjustifiable" risk that his conduct will cause harm to another. *Id.* at 1824 – 25. The *Borden* plurality further concluded that the ACCA's use of the phrase "against another" "demands that the defendant direct his action at, or target, another individual," and "[r]eckless conduct is not aimed in the prescribed manner." *Id.* at 1825. Crimes covered by the ACCA's force clause "are best understood to involve not only a substantial degree of force, but also a purposeful or knowing mental state – a deliberate choice of wreaking harm on another, rather than mere indifference to risk." *Id.* at 1830. ACCA sentences requiring only reckless *mens rea* would

improperly "impose large sentencing enhancement on individuals … far afield from the 'armed career criminals' ACCA addresses." *Id.* at 1825.

Therefore, an ACCA violent offense is a crime involving the *intentional* use, or the *intentional* attempted or threatened use, of violent force against the person of another. A crime involving reckless or negligent use, or the reckless or negligent attempted or threatened use, of violent force against another person is not an ACCA predicate offense.

### C. South Carolina's Criminal Domestic Violence Statutes.

In 1984 S.C. Acts No. 484, § 1, effective June 22, 1984, South Carolina enacted its first criminal domestic violence law, codified at S.C. Code Ann. § 16-25-20, and which provided:

> It is unlawful to: (1) Cause physical harm or injury to his or her family or household member, (2) offer or attempt to cause physical harm or injury to his or her family or household member with the apparent present ability under circumstances creating fear of imminent peril.

The penalty for violating § 16-25-20 was a fine of not more than $200.00, and not more than 30 days in jail.

1993 S.C. Acts No. 519, § 1, left § 16-25-20 unchanged but added §16-25-65, which created the new statutory offense of Criminal Domestic Violence of a High and Aggravated Nature (CDVHAN).

Under 2003 Act S.C. Acts No. 92 § 3, § 16-25-20 remained unchanged, but a new penalty was added which provided that a person who had been twice convicted of misdemeanor criminal domestic violence within the past ten years was subject to a minimum of ninety days to a maximum of three years in jail.

Canada's 2006 CDV 3rd conviction was under this new 2003 subsection. Canada had two prior convictions for misdemeanor criminal domestic violence, his third conviction subjecting him to the enhanced three-year maximum imprisonment penalty.  (JA124).

2003 S.C. Acts No. 92 § 3 also amended CDVHAN to provide:

(A)  A person who violates Section 16-25-20(A) is guilty of the offense of criminal domestic violence of a high and aggravated nature when one of the following occurs:

(1) the person *intentionally* commits an assault and battery which involves the use of a deadly weapon or results in serious bodily injury to the victim; or

(2) the person *intentionally* commits an assault, with or without an accompanying battery, which would reasonably cause a person to fear imminent serious bodily injury or death. …
(Emphasis added).

2015 S.C. Act No. 58 Pt. II, § 4 rewrote South Carolina's CDVHAN statute, removing the intentionality element of this statutory offense.

Accordingly, the only time any South Carolina criminal domestic violence statute provided a *mens rea* element was under the 2003 version of CDVHAN, which

55

required an *intentional* act on the part of the perpetrator. This *mens rea* element was deleted from the statutory CDVHAN offense in 2015.

### D. No South Carolina case defines the *mens rea* required to commit CDV.

"When evaluating a state court conviction for ACCA predicate offense purposes, a federal court is bound by the state court's interpretation of state law, including its determination of the elements of the potential predicate offense." *Drummond*, 925 F.3d at 689 – 90.

No South Carolina case discusses the state of mind necessary to be found guilty of the misdemeanor criminal domestic violence crime under § 16-25-20.

However, South Carolina has answered the question of what *mens rea* is required to commit a crime where there is no statutory provision defining that requirement. In *State v. Ferguson*, 302 S.C. 269, 272, 395 S.E. 2d 182 (1990), the South Carolina Supreme Court said:

> In offenses … under statutes which do not disclose a contrary legislative purpose, to constitute a crime, the act must be accompanied by a criminal intent, or by such negligence or indifference to duty or to consequences as is regarded by the law as the equivalent to a criminal intent.

Further, when a statute is silent as to *mens rea*, South Carolina courts do "not weaken the legislators' decision to criminalize [certain actions] by

imposing a high standard of intent." *State v. Sterling*, 396 S.C. 599, 616, 723

S.E.2d 176, 185 (2012).[4]

### E.   CDV 3rd Offense can be committed through reckless or negligent conduct and, therefore, is not an ACCA predicate offense.

Following *Borden*, a negligent or reckless intent to use physical force, or a

reckless or negligent intent to cause physical contact, is not enough to satisfy the

*mens rea* required of an ACCA violent felony.   What is required is "a deliberate

choice of wreaking harm to another …."  141 S. Ct. at 1830.  The *mens rea* necessary

to support a conviction for CDV 3rd falls far short of this requirement.

Since 1984, South Carolina's CDV statute has provided it is unlawful to

"cause physical harm" or "offer or attempt to cause physical harm" to a class of

people.  The Oxford English Dictionary Vol. II 195 (1961) defines "cause" as "I.

General Senses.  That which produces an effect; that which gives rise to any action,

phenomenon, or condition …(2) [a] person or other agent who brings about or

occasions something, *with or without intention*." Emphasis added.

---

[4] This Court certified this question to the South Carolina Supreme Court: "What mental state is required to commit South Carolina Criminal Domestic Violence of a High and Aggravated Nature, in violation of S.C. Code § 16-25-65?" *United States v. Clemons*, No. 22-4152, Dkt. #33 (4th Cir. Oct. 3, 2022).   The certification order noted that since the Supreme Court's *Borden* decision, this "issue has arisen frequently in other cases," including Canada's.   *Id.* at 3.  The South Carolina Supreme Court agreed to answer the certified question and, absent extensions, briefing should be complete by mid-January 2023.  *United States v. Clemons*, No. 2022-001378 (S.C. Oct. 26, 2022).

Black's Law Dictionary 200 (5th Ed. 1979) defines "cause" as " [t]hat which in some manner is accountable for conditions that bring about an effect or that produces a cause for the resultant action or state."

Throughout its evolution, § 16-25-20 has been silent on the *mens rea* required to violate the statute. CDVHAN, however, has not been so completely reticent. Before its amendment in 2003, the statutory crime of CDVHAN was defined by simply incorporating the elements of the then common-law crime of ABHAN into the statutory crime of CDV. After its 2003 amendment, CDVHAN criminalized only the *intentional* commission of assault and battery which involved either the use of a deadly weapon or resulted in serious bodily injury, and the *intentional* commission of an assault, with or without a battery, which would "reasonably cause a person to fear imminent serious bodily injury or death." The intentional conduct required to commit CDVHAN remained part of South Carolina's criminal code for eleven years until the passage of 2015 S.C. Acts 58 Pt II, § 4, which struck the "intentionality" element of CDVHAN, reverting to the original formulation of both CDV and CDVHAN – "[i]t is unlawful to: *cause* physical harm or injury" or "offer or attempt to cause physical harm or injury" to specific people. The 2015 CDVHAN amendment's preamble says its purpose is to "amend section 16-25-65 … so as to restructure the offense, [and] *redefine the elements of the offense*."

The point of the ACCA is "to mark out a narrow category of violent, active crimes." *Borden*, 141 S. Ct. at 1830. To do so requires ACCA predicate offenses to be limited to those offenses which require a defendant to act with "deliberate choice [to use force] with full awareness of [the] consequent harm," *id.* at 1824 (Thomas, J., concurring in the judgment), and not include offenses which require proof only that the defendant acted recklessly or negligently.

Since first enacted in 1984, South Carolina's CDV statute has only required a defendant to "cause" or offer or attempt to "cause" physical harm or injury. However, the more serious offense of CDVHAN did, for eleven years, require a defendant to have "intentionally" committed an assault and battery with a deadly weapon or resulting in serious bodily injury or "intentionally" committed an assault reasonably causing the victim to fear serious bodily injury or death.

While South Carolina's former iteration of CDVHAN might rise to the level of a *Borden* "deliberate choice [to use force] with full awareness of [the] consequent harm," ACCA predicate offense, South Carolina's CDV offense, requiring only that the defendant "cause" bodily injury, or threaten the same, does not.

If the plain language of the statute is not enough to establish that the *mens rea* required for CDV 3rd includes negligent or reckless conduct, Canada respectfully submits *Ferguson* binds this Court. *Ferguson* answers the question of what *mens*

*rea* is required to commit CDV 3rd, and that answer includes negligence and recklessness. Accordingly, a CDV 3rd conviction does not require proof of "a deliberate choice of wreaking harm to another." *Borden*, 141 S. Ct. at 1830.

South Carolina's CDV 3rd offense is not an ACCA predicate offense, and the district erred so ruling. Canada's sentence should be vacated and the case returned to the district court for resentencing.[5]

## VI. CONCLUSION

This Court should vacate Canada's conviction and sentence and remand for dismissal of the indictment or, alternatively, remand for resentencing.

### Statement Regarding Oral Argument

This case presents an important question of first impression regarding *Bruen*'s impact on Second Amendment litigation. The Court's answer to that question will affect not only the hundreds of defendants charged under § 922(g)(1) in the Fourth

---

[5] Canada recognizes that *Drummond* held South Carolina CDV 3rd qualifies as an ACCA predicate. *Drummond*, however, addressed only the question whether CDV 3rd requires "*violent* force"; it did not address or resolve the question of what mens rea satisfy the statute. *See Drummond*, 925 F.3d at 688-96. As a result, *Drummond* is not controlling as to whether CDV 3rd can be committed recklessly or negligently. *See United States v. Norman*, 935 F.3d 232, 240 (4th Cir. 2019) ("[J]udicial decisions do not stand as binding precedent for points that were not raised, not argued, and hence not analyzed."); *see also id.* ("Since we have never squarely addressed the issue, and have at most assumed it, we are free to address the issue on the merits.").

Circuit each year, but potentially also defendants charged under related firearms statutes (e.g., 18 U.S.C. §§ 922(g)(3), 922(g)(5), 922(g)(9)).  In addition, whether South Carolina CDV 3rd qualifies as an ACCA violent felony is a recurring question with the potential to substantially affect the severity of numerous defendants' sentences.  Canada believes oral argument would assist this Court in resolving these important questions.

CALLISON TIGHE & ROBINSON, LLC

s/Louis H. Lang
Louis H. Lang, Esq.
Fed. I.D. No. 240
1812 Lincoln Street, Suite 200
PO Box 1390
Columbia SC  29202-1390
Telephone:  (803) 404-6900

/s/Cullen O. Macbeth, Esq.
Cullen O. Macbeth
Assistant Federal Public Defender
OFFICE OF THE FEDERAL
PUBLIC DEFENDER
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (301) 344-0600
Email: cullen_macbeth@fd.org

Attorneys for Zavien Lenoy Canada

## Certificate of Compliance

1. This brief has been prepared in Microsoft Word using 14-point, proportionally
   spaced, Times New Roman typeface.

2. Excluding the items identified in Fed.R.App.P. 32(f), this brief contains
   13,521 words.  On November 30, 2022, this Court granted Canada's motion
   for leave to file this brief in excess of word limitations allowing 13,521 words.


/s/Louis H. Lang, Esq.
CALLISON TIGHE & ROBINSON, LLC
Louis H. Lang, Esq.

## Certificate of Service

I certify that, on December 2, 2022, I electronically filed the foregoing Opening Brief of Appellant with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

I further certify, that on December 2, 2022, I served the Joint Appendix Sealed Volume II, via USPS, on counsel listed below:

Justin W. Holloway
OFFICE OF THE U. S. ATTORNEY
One Liberty Square
55 Beattie Place
Suite 700
Greenville, SC 29601

s/Louis H. Lang, Esq.
CALLISON TIGHE & ROBINSON, LLC
Louis H. Lang, Esq.
Fed. I.D. No. 240

63